Good morning, Your Honors. May it please the Court, my name is Rod Dymbowski. I represent Bellevue Master. I'd like to reserve five minutes, if I can, for rebuttal. I'll be giving a hand in most of that. Thank you very much. Your Honors, we started this morning with cases focused primarily on issues of law and have tended, in the arguments, to drift toward cases focused on disputes of fact. And this case before the Court follows that pattern and shows why summary judgment should not have been granted below. We have appealed four issues, whether there was an ovation, whether the District Court improperly denied our summary judgment motion and granted summary judgment against us. Our surety ship, waiver, and estoppel. We submit to the Court that we presented sufficient factual evidence of a material dispute that would support each of those legal defenses to this Commission claim, such that summary judgment certainly should not have been granted against Bellevue Master and, in fact, should have been, as a matter of law, granted in our favor. Turning first to novation. Before the Court, frankly, our state law issues. And we advanced Bellevue Master defense to this Commission claim, a novation argument. The Court understands from the record that our client, Bellevue Master, was the second developer of a project in Bellevue, Washington, across the lake here, called Lincoln Tower. And there was a residential condominium component to it with 148 units. Our client hired Landover Corporation, doing business as Colwell Banker Bain and their agents, Miller Torgerson and Associates, to market those units before they were built. They went out and they marketed them. The marketing and the hiring agreement was done pursuant to a letter of authorization or a Commission agreement. In September of 2001, the United States was attacked by terrorists, the economy declined, and the project was shut down. Before it rose out of the ground. The letter of authorization was converted to a month-to-month program, and eventually the project was sold to Link LS Holdings. The record demonstrates, Your Honors, that LS Holdings, in the purchase and sale agreement for the overall project, assumed the Commission agreement that Bellevue Master had with the agents. The record also shows, Your Honor, that the agents, plaintiffs here, performed under that assumed Commission agreement. Part of the problem, it seems to me, is a practical matter. I mean, of course they would have, quote-unquote, performed under it. They were now the guy in the driver's seat. But that doesn't mean that they consented or agreed to have a substantial debt assumed. Well, Your Honor, we contend that it does. And we contend that when looking at all of the conduct, the totality of the circumstances, and the subsequent contract they entered into that said, we waive and discharge and eliminate all prior Commission agreements, that they did, in fact, intend to do that. Well, you know, that just simply means that the new kid on the block isn't going to be responsible for Bellevue's problems. I don't know why that means that these guys agreed that, despite that, they were going to be responsible for them. Well, they did initially, Your Honor, because, remember, L.S. Holdings assumed our contract, performed under it. And that's not the only evidence. They sent a final bill to us, didn't ask for all the other Commissions that they say were apparently due. They're under a fiduciary duty to speak and ask for those. This is not like the cases where you're selling one house and Commission is payable upon presentation of a ready, willing, and able buyer. Here we have an ongoing contractual relationship to sell out a whole project. And they're paid on a monthly basis, plus the flat fee. But in your brief, what I couldn't understand was you seem to say, of course, Landover was not a party to the contract. And you seem to say that by its silence, it intended to relieve Bellevue of all of its obligations. I mean, what? That is one piece of evidence that we do point to, Your Honor, because silence coupled with a duty to speak can sustain a waiver. Where is the duty to speak? The duty to speak arises from their fiduciary obligations as real estate agents to us, their principal. And those are not discharged. You have a duty under Washington real estate law to keep your principal informed at all times. And that does not terminate here where they have an ongoing relationship until August 27, 2003. What information were they obligated to pass on in this situation? The chief piece of information, Your Honor, would be that when we're going to send you, Bellevue Master, a final bill on August 27, 2003, that, hey, we want you to pay all of these unearned flat rate commissions. That would be the one thing. How about a second thing? The second thing would be that they are entering into a new agreement with the new owner that substantially changes and alters the obligations, which goes to our surety ship defense. Since your client was a party to this new agreement, they still had a fiduciary obligation to inform you of something that you obviously already knew? We were not a party to the new. Bellevue Master was not a party to the third and final commission agreement, Your Honor. We were merely an affiliate of L.S. Holdings and an intended third-party beneficiary of that. But we had no knowledge of it. Okay. I'm sorry. Who's the duty owed to? The duty of the agent? It's owed to his principal. I know. By name. Here. Who do they owe a duty to say something to? Bellevue Master, L.L.C., and its representatives. Howard Huang, the principal. But Thunder was no longer an agent. Well, no, I just don't. I mean, I have to confess, I just don't get it. I want to help you get it, Your Honor. I know you do. That's why I'm trying to. I'm trying to. Here's our phone numbers. Yeah. L.S. Holdings, the last buyer who built the project, assumed the commission agreement that we had. They performed under it and the agents performed under it. And then they cut a new deal. That is a novation not expressed, certainly implied. Is there any Washington law on implied novation? Your Honor, there is no opinion in Washington that uses the phrase implied novation. There are cases which we have cited that, based on the facts, the court found a novation by implication. Is this an issue that should be certified to the Washington Supreme Court? Yes, it is, Your Honor, because our position here, and we asked the district court to do that, and the district court declined. One of the problems with the district court's opinion was it then surveyed state law, said even if Washington were to recognize it, it implied a very high burden of proof, and then held our facts to that high burden of proof, weighed the evidence, and ruled against us. We think that the record of the case, the issue should be certified, and this court, of course, can do that, and ask our Supreme Court, does Washington recognize implied novation? If it does, what are the evidentiary standards that it applies? Our courts do recognize contracts from implication that are implied from the facts, and we think that, therefore, our courts will, if asked, expressly recognize it. We do cite three cases that, in practice, although not labeled, recognized it. Sutter v. Moore in the Lincoln Building was one. We've got two. Excuse me. Go ahead. I want to step back to something you said a moment ago. L.S. You said L.S. bought this project. Yes. And then Landover performed under the original agreement with your company for a period until the time for that contract ran out, and then at that point they entered into the second agreement. Very close, Your Honor. Landover performed under our contract with L.S., the buyer, until they entered into an L.S. performed by paying them until they commenced negotiations and entered into the November 7, 2000 agreement, the new commission agreement. To be very explicit, yes, there was performance by the new buyer under our commission agreement, and the broker here, Landover, looked to and only looked to the new buyer, L.S., for payment under the agreement. That was from the point in time after you sold to L.S.? Correct. And then how was the what was due them handled for the period of time before you sold to L.S.? Prior to closing of the transaction on August 27, they submitted to L.S. And prior to that, Landover submitted their billing to us, and that's in the excerpts of record from 99 to 103 and 106 to 115, and we paid. And after closing, they submitted their billings only, only to L.S. Holdings, and L.S. paid. And then they entered into a new agreement. So the judgment that has been levied against you is for what services then? The judgment levied against us is for approximately $750,000 in commissions arising from 89 contracts that were acquired prior to our sale. But never consummated because the project was tubed after 9-11? Correct. None of those contracts closed. Every single unit that has been sold in that condominium was pursuant to a new contract entered into with the new owner of the project. Many of the buyers, if not all, were the same. But not a single contract retained by these plaintiffs was used to close a deal at this sale. So what were you paying them for? You said then they sent you a bill and you paid them. You didn't pay them the commissions. What were you? The commission structure was in two parts, Your Honor. There was a flat fee based on sales price but also a monthly ongoing salary component and expenses. We paid the salaries and expenses. I see. All right. Thank you. Ten minutes? Nine minutes. Okay. But not the commission? Well, in Washington, Your Honor, under our law, every payment to a broker is a commission. This commission was structured in two or three parts. You could separate out the salaries and expenses from? That's what happened here because these flat rates. And that's what the $750,000 is all about. The $750,000 is the flat rate portion of the commission. I understand. And it wasn't payable until closing. Thank you. That's our practice. Your Honor, I still need to answer your question because you're confused and I don't want you to leave this hearing confused about what we're saying. Let me back up to basic novation principles and see if I can articulate how we win under our facts. Would that help the court? Sure. A novation is a substitution. It can be a substitution of obligations or of parties. I understand. Here we believe when our commission agreement was when the new owner, L.S. Holdings, substituted in for Bellevue Master, under the existing commission agreement at the time of sale, we had a novation. And that agreement doesn't say anything at all about taking over the obligation to pay the accrued commissions from Bellevue. Indeed, it more or less says the opposite, that landowner isn't going to be responsible for any commissions from Bellevue. I think, Your Honor, what you're talking about is the third commission agreement, the final one. I'm talking about the second one. Bellevue's agreement with landowner doesn't say anywhere that Landover is taking over Bellevue's obligation to pay commission. Right? I mean, it just doesn't. I think the parties may be mixed up there. Are you talking about the overall purchase and sale agreement for the project? I'm talking about Bellevue's. When Bellevue sells the project, okay, it does not involve Colwell Bank, the real estate agents, at all. They're not part of that transaction.  Nothing in the paperwork for that transaction reflects that Bellevue's commission obligation is being taken over. Incorrect, Your Honor. Okay. Respectfully. Table C-3, Excerpt of Record 332. That table, and this is one of the places where the district court made a mistake. That table includes leasing and brokerage commissions. Okay? Excerpt of Record 332. That table lists the commission agreement that we had with Landover, and it says that that is assumed by L.S. Holdings. L.S. Holdings assumes the commission agreement and, obviously, the obligations that go with it, and that is to pay. But there's absolutely nothing to indicate that the realtors said okay by me. Their conduct. Okay. But you agree with me up to that point. There's nothing in there that says okay with us to have $800,000 that's owing to us picked up by these other folks. That's right, Your Honor. It's not in the purchase and sale agreement because they weren't a party to it. Okay. So then we have to look to the fact that they sent bills to Landover afterwards. Is that? That's one piece of evidence. Right. Their silence is another piece of evidence. The testimony of Ms. Torgerson and Mr. Miller that they never expected to look to Bellevue Master for payment and only intended to be paid from Landover is the fourth and fifth piece of evidence. The sixth piece of evidence is the new agreement that they entered into that said we're going to get paid for all 148 units under the new agreement. Your Honor, and we've got to look at the circumstances and context in which this is done. We sold the project. They were excited to be on the new team to continue marketing it. And if permitted to present evidence at trial, the evidence shows in the record and will show that they never expected to go back to Bellevue Master for payment of those commissions. They always looked to L.S. Holdings for it. They sent us a final bill. They began billing them. They never continued to bill us both. And in the Fairbanks case from this court, it says that agreement from the new creditor to pay that is adequate, to pay a debtor is adequate. So, Your Honor, it is an implied novation case at its core, and we think that the facts are sufficient to get us there. Four minutes. Is that total? Yeah. So I should stop. It probably would be prudent. Thank you. Mr. McLaughlin. Thank you, Your Honor. Dennis McLaughlin from the Olympic Law Group. On behalf of the Appellees and Cross Appellants Landover, which is incorrectly described as a real estate broker here in the state of Washington, what I'm asking this court to do is to affirm Judge Zilley's order granting summary judgment, striking the novation, surety, waiver, and estoppel defenses. If this court chooses to send this matter back for trial then and only then, we would request the court to consider our cross appeal on the fact that the court also struck our claim for quantum merit, since it was based for commission on this transfer of personal property and not real property. I will get to that later in my argument. Before you get to your argument, would you answer the question about whether or not the question of implied novation should be certified to the Washington Supreme Court, particularly on the burden of proof issue? Not under the facts of this case. Because? Because. In order to have an implied novation, and I will invite you to ask the question to Mr. Dombowski when he comes back before you, I'm just going to give a basic primer on contract law and how I understand it. A novation is a new contract between, in this case, three parties. We have a creditor, which in this case is Landover, who's owed $739,000 in commissions that they earned. And then you have an original debtor, which is Bellevue Master, and then the alleged subsequent debtor, which is Alice Holdings. In order to have a novation, you need agreement among the three of them. One of the essential things that you need to find in order to have a novation is an agreement by Bellevue Master, or an agreement by Landover, the creditor, to release Bellevue Master from its obligation. Well, clearly Landover didn't do that. The question is implied novation. I understand that, and I'm going to continue that. In every case, in every jurisdiction, that is considered implied novation, it revolves around this contract principle of offer and acceptance. In order to have this tri-party agreement, and the essential term is this release provision, you have to have an offer to release me coupled with acceptance, where the implied novation through silence or conduct has been applied. It is in the creditor's acceptance of the offer from the original debtor. You have no offer here from the original debtor. In fact, the undisputed testimony from everybody in this case is that the original debtor, Bellevue Master, walked away from the transaction and never spoke to Landover. In every case where there's been any kind of implied release or implied novation, there's been direct communication between the original creditor and the original debtor. As to, it is my desire to you, Mr. or Ms. Creditor, to have you look solely to the subsequent debtor in order to get your payment. Then and only then can the creditor manifest an assent to that offer through conduct or silence. Where it's been applied, that is the circumstance in which it's applied. There's a new contract, there has to be an offer and an acceptance. Here we have no offer. This is a peculiar case because this sophisticated developer who sold their project for $45 million never wrote a letter, never notified, never did anything to put Landover on notice that LS Holdings had assumed the obligation. They just walked away from the project owing $739,000. Thank you. When, if ever, did your client see this contract between Bellevue and LS? Before or after they entered into the subsequent agreement for commissions from LS as they took it over? In the supplemental excerpts of proceedings that are before you, there are declarations from Ms. Torgerson and Mr. Miller as well as a declaration from myself that specifically and undisputedly show that the first time that that contract was ever viewed by Landover was after March of 2003, after they filed their state court action against Bellevue Master, or 2004, after they filed their state court action against Bellevue Master and got a request for production to see it. And after they had entered into the new agreement with LS. And that is a key fact, Your Honor, because what is clear and undisputed in this record by the declarations of Ms. Torgerson and Mr. Miller was that LS Holdings, the purported subsequent debtor, never notified Landover that they had assumed the obligation. Not only did Bellevue Master walk away from the project and not notify Landover of this assumption and ask their consent for it, which is what they should have done. Bellevue Master is the party to blame here for this situation because they should have asked, they were the one who had a duty to ask to be relieved from liability and they never did it. Not only did they not ask to be relieved from liability, which I guess is something they wanted, but LS Holdings, being a shrewd business person, did not say anything about the assumption. There's some evidence in the record that Landover thought there was an assumption, but then when they said, okay, here's a new agreement for you to sign, identical to the old agreement, they go, we're not going to sign that. Well, if Landover had seen this contract between Bellevue and LS and then proceeded as they did, there'd be a strong argument of implied acceptance except that that would do away with a guarantor, which would be Bellevue backing up LS's obligation had they not gone broke or something like that. May I respond? Yes, sure. If they had seen it, then possibly under normal circumstances. But this agreement in particular, and Judge Ryder had it right on the head, does not say that there's a subsequent debtor. There's nothing in that agreement that says LS Holdings is going to assume the obligation to pay commission under the 2000 LOA. It's not there. This reference to Schedule C-3 is a misnomer. It does say in the heading obligations to be assumed by purchaser, but there's another provision in paragraph, in Section 10 of the actual contract that says nothing in the headings is to be given legal effect. When you see, and this is what I would direct your attention to if you're going to go back in the record to make this determination, is where is Schedule C-3 referenced in the agreement itself? It is not referenced in the part that talks about assumptions of liabilities. There is no language that says LS Holdings, the buyer, is going to assume the liabilities on Schedule C-3 in the actual agreement. C-3 is merely used as a determination of what is the property that is going to be transferred from one to the other. There's nothing about the delegation of duties. So under this circumstance, this particular contract would not put somebody on inquiry notice or other kind of notice of an assumption because of the way it was written. So you're suggesting that Bellevue wouldn't have a good contract action against LS to fulfill its obligation to pay the debt to you that they've assumed. Under the terms of the written contract, I would agree with you. It wasn't until the depositions of James Melby, who is the managing member-slash-president of the LS Holdings, where he said he did agree to assume the obligation. Based on that deposition testimony, perhaps they'd have a better chance than on the written agreement. But what's key here, and I want to get back to this, is that Landover, all that they know is the project has been sold to the subsequent developer. There are unsold units, and this subsequent developer, and this is very, very, very important as well. Under the 2003 LOA, the last one, it limited its liability for commission on new contracts to be signed after November 7, 2003. It limited its liability to pay commissions on contracts that it signed as the owner. It did not agree to pay the commissions on the 89 contracts that were procured by the realtor in this case. Now, what's important under Washington law, the Bloom v. Christensen case, is that a realtor's commission is earned at the time they procure the contract. It is not upon the sale of the property.  So what is important is when you get the contract, you have earned your commission. What is equally important under Washington law is when you get the contract signed, your fiduciary duties to the seller end. So why is that important? Well, that is important because the focus for this court, as it was for Judge Zille, is on the contracts. It is not on the units or the sale of those units. The 2000 LOA had no provision that modified this common law rule. So at the time that this transaction between Bellevue Master and Ellis Holdings took place, Landover had earned $739,000 worth of commissions. They found $52 million worth of buyers for the seller to buy these condominiums that were to be built. And they were owed that commission. The contract that was entered into on November 7, 2003, did not address those 89 contracts. It says we'll pay commission on new contracts that we sign and only the ones we sign. What is important about that is there was a clause in the standard purchase and sale agreement between the developer and the purchasers that said they could terminate their contracts on December 31, 2003 if they weren't built. So it was conceivable at that time that a purchaser for a unit would terminate the contract, commission would still be due because it's not the realtor's fault it wasn't constructed, but that the unit would have to be subsequently resold to another purchaser. Now, moving to the other arguments. The surety ship defense fails as a matter of law. Perhaps not for the reasons stated by Judge Zille in his order, but on the Henneman case. And in that case, in order to have a resolution of the surety ship defense, you must have actual knowledge given to you that you are a surety. So you have to be actually notified by the assignor or the assignee of the assigned obligation that there's been an assignment. Washington is a minority jurisdiction that also requires the creditor to consent to the assignment. Here the record is clear there was no actual notice of the assignment. Therefore, the surety ship defenses are not available to Landover, I mean to Bellevue Master. Finally, as to waiver and estoppel, there is no duty to speak. This case law that was cited in the brief by Mr. Dombowski on behalf of Bellevue Master has been replaced by statute. The statute, section 18.86.040 of the revised code of Washington, limits what the fiduciary duties used to be a common law to specified fiduciary duties. The duty to disclose all material facts is no longer in there. The closest that the statute comes is as to disclosing conflicts of interest, and there is no conflict of interest situation here where you represent both a buyer and a seller. Moreover, there was an assignment according to their theory of the case, if they were trying to prevail, and they've agreed there was an assignment of the rights under that LOA, the 2000 LOA. And if there was an assignment of those rights under the 2000 LOA, then the fiduciary duty would be assigned from Bellevue Master to L.S. Holdings. So then, as was aptly asked by the bench, to whom was the fiduciary duty owed? Well, if you did, in fact, assign the 2003 LOA and the obligations were assumed, then the fiduciary duty would go to the person who is the subsequent purchaser. Finally, on the Quantum Merowick claim, Your Honors, what we're claiming here is that during this process of this $45 million that Bellevue Master received for the sale of this project, $3 million was allocated by agreement between Bellevue Master and L.S. Holdings for the purchase and sale agreement. So in other words, these 89 purchase and sale agreements were assigned from Bellevue Master to L.S. Holdings. Bellevue Master received $3 million for those agreements. We procured those agreements for Landover. This is an alternative theory. Right, this is an alternative theory, and this is the part of our process, and I figured I would address it in the time that remains. And this is an alternative theory. If you sustain Judge Zille's order and you affirm it, then there will be no necessity to consider our Quantum Merowick claim because we will receive the compensation to which we are entitled. If, however, you remand it back for trial, we are going to ask that you consider this alternative theory and just say when they get paid $3 million for assigning contracts, it's the sale of those contracts that would trigger the Quantum Merowick claim. Contracts are personal properties. What they assigned were their rights to receive money in exchange for a condominium, and therefore, it's personal property that was transferred. It's outside the statute of frauds that requires a written agreement for commissions based on real property. Unless there's questions from the bench, I'd like to save everybody's time and get you to Nebraska. Thank you. Thank you, Mr. McAuliffe. Mr. Dembowski. The court's interested in whether or not Plaintiff Landover knew about this assignment. I turn the court's direction and ask the court to look at Excerpt of Record 439. Those are the notes by Ms. Torgerson. Number one, under LOA contract, told by Richard Leiter and Ron Smith that Kemper Development, that's LS, was assuming our contract and the team was on board. Richard Leiter is Bellevue Masters' local representative. This statement, this argument, that there's nothing in the record that says that Landover knew about this sale of the project and the assignment of the contract and the assumption of it by us, is flatly contradicted by Ms. Torgerson's own notes. She met with Ron Smith, who's the LS representative, once when he told us the above, and met with Jim Melby, another LS representative, once, prior to the announcement of the acquisition. The record contains evidence in addition to their testimony that, in fact, Your Honors, they did know about the assignment and the assumption of the commission agreement. Is there a time that these statements were made in conjunction with the various transactions? This was made before the announcement of the transaction. It was before the closing, long before the closing, Your Honor, of the sale. Of Bellevue LS. Correct. Okay, thanks. That evidence is in the record. In addition, if they didn't know about the assignment and the assumption of the commission agreement, how did they know to send the bills through August 27th to us and then send them for after August 27th to LS? They knew. They knew about the assignment. They knew about the assumption. Those bills were sent out on the terms and conditions of that commission agreement. So they knew about the deal. Correct. But there's nothing in the deal that discloses it. That's the problem. Sure, they knew that the project had been sold. Yes. And they knew to look to the new buyer for payment. It doesn't say anything at all about the relationship in the past. That's where I still continue to have the problem. Sure, they knew about it. As a practical matter, they're going to send the bill to the person who's running the project now. Correct. I mean, that's fine, but that doesn't mean that they are, in doing that and continuing to get paid, that they're absolving Bellevue of its entire obligation. Well, and, Your Honor, we think that the evidence does show that they intended to do that. And certainly, if not on that commission agreement, when they went and entered into the third and final one and substantially changed the terms, that is evidence that they certainly intended to discharge and release Bellevue Master Commission obligations because that final agreement covers all 148 units in the project, covers commission for all of them. The ones that they pre-sold are listed there in the chart and are listed as commissions being paid on those prices for those units under the final deal. So certainly that last contract applies to that. With respect to whether or not they had a continuing duty to keep Bellevue Master informed, Chapter 1886 RCW, we are general counsel to the Multiple Listing Service here and the Commercial Brokers Association. The statutory duties in 1886.030 RCW are specified, and in addition to those imposed by Washington's common law, Washington's fiduciary obligations in the common law. And 1886 explicitly says that in a later section, that it only supplants and replaces where explicit. It does not eliminate an agent's fiduciary duties. And those fiduciary duties, including the duty to keep us informed, continued up until the closing date, August 27, 2003. And if they expected to be paid from us, the portion of the commissions that was flat fee, they had a duty to call and tell us, at least up until August 27, the end of the contract saying, we'd like to be paid. When they didn't, we, of course, were entitled to rely on that silence. And then they went and cut a new deal. So we think that if there isn't an ovation on the first one, when they agreed to take a new debtor, L.S., certainly, Your Honor, there's an ovation when they entered into a new contract and completely changed the parties and the terms of the deal. This is a complex ovation case. It's two steps. We have two arguments. One is a substitution of parties. The second is a substitution of contract and obligations and parties. Finally, on the cross appeal, and very briefly, the district court got that right. Washington law required these agents can only be paid a commission on something they're licensed to do, and that is to render real estate brokerage services. 1885 RCW says that. They are not securities dealers. They do not get commissions or pays to sell contracts. And their theory of unjust enrichment rests on that. No Washington case supports it, and the court should not turn our law upside down in the state by awarding judgment that way. We'd ask for reverse for trial, and thank you. Okay. Thank you. Thanks, counsel. The matter just argued will be submitted.
judges: Nelson, Rymer, Beam